UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| TIFFANY N. JACKSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1:22-cv-00251-HAB |
| | ) |
| EXECUTIVE MANAGEMENT SERVICES, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff, Tiffany N. Jackson ("Jackson"), worked for Defendant, Executive Management Services ("EMS"), for over a decade before her termination. She subsequently sued EMS for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. (ECF No. 5). And she brings an alternative claim for retaliatory discharge under Indiana law. (*Id.*). EMS counters with its own explanation for Jackson's termination—repeated violations of its attendance policy. Although Jackson challenges EMS's policy, it clearly requires employees to work through the end of their shift. And on August 11, 2021, Jackson abandoned her post without prior approval from her managers.

Presently before the Court is EMS's Motion for Summary Judgment. (ECF No. 19). The motion has been fully briefed (ECF Nos. 22, 26, 28) and is ripe for ruling. For the reasons below, EMS's Motion for Summary Judgment will be GRANTED.

### I.    Factual Background

EMS is a commercial cleaning contractor. (ECF No. 20 at 1). Jackson, an African American woman, started working for EMS as a part-time, at-will cleaner in 2008. (*Id.* at 1-2). At

the time she was hired, Jackson signed an acknowledgment form confirming that she reviewed EMS's procedures and received its company handbook. (*Id.* at 2). Her duties as a part-time cleaner included cleaning customers' bathrooms, dusting, sweeping, and trash removal. (*Id.*)

In May 2017, EMS promoted Jackson to Area Supervisor, where her job duties increased to delivering supplies, checking the cleanliness of buildings, and cleaning. (*Id.* at 3). As a supervisor, she reported to EMS Branch Manager, Bob Bloom ("Bloom"). (*Id.*). In her new role, Jackson had a crew of cleaners that she oversaw and who reported to her. (*Id.*).

In September 2019, EMS invited Jackson to apply for another promotion to Area Manager. (*Id.* at 4). Although she did apply for the position, Jackson was unable to attend her interview because she had to cover another EMS employee's shift. (ECF No. 26 at 3). Jackson notified EMS that she would need to reschedule the interview, which EMS characterized as her "fail[ing] to appear." (*Id.*). Still, EMS permitted Jackson to reschedule her interview. (ECF No. 20 at 4).

EMS later selected Ron Hoelle ("Hoelle"), a white male, for the position of Area Manager. (*Id.*). Without raising any complaints internally, Jackson filed a Charge of Discrimination with the Equal Opportunity and Employment Commission ("EEOC") and the Fort Wayne Metropolitan Human Relations Commission ("FW Commission") alleging that she did not receive the promotion due to her race and gender. (*Id.*). She then filed amended charges on November 15 and December 13, 2019, alleging the same. (*Id.*).

On April 30, 2020, after investigating Jackson's charges, the FW Commission determined that there was no probable cause to believe that EMS violated her rights under Title VII. (*Id.*). Jackson appealed the determination, but the FW Commission denied the appeal, and the EEOC adopted its findings. (*Id.*).

In March 2021—almost a year after the FW Commission's determination—EMS issued an Employee Communication Form ("Form") to Jackson for violating the company's attendance policy.[1] (*Id.* at 5). EMS's attendance policy emphasizes the expectation that employees work as scheduled, including working "through the end of their scheduled work shift." (*Id.*). And it states that if "for any reason an employee is unable to report as scheduled, it is necessary to call your supervisor or the office no later than three (3) hours before the beginning of your shift." (*Id.*). Under the policy, texting the employee's manager "is considered an improper reporting of an absence." (*Id.*). An employee violates the policy when they accrue "three (3) unexcused absences within a thirty (30) day period."[2] (*Id.* at 3). The Form memorialized three unexcused absences by Jackson within a thirty-day period from January to February 2021.[3] (ECF No. 21-3 at 5).

On June 14, 2021, Jackson started limping from hip pain after she loaded a floor-cleaning machine into her company vehicle. (ECF No. 20 at 5). After finishing her shift, she reported her injury to Hoelle and he submitted Jackson's accident report to EMS's worker's compensation carrier. (*Id.*). On August 23, 2021, the worker's compensation carrier informed Jackson that her claim was denied pending investigation.[4] (ECF No. 21-2 at 111). Days later, Indiana's Worker's Compensation Board issued its Notice of Denial of Benefits to Jackson finding that her medical records did not show a workplace accident. (*Id.* at 128). Jackson never appealed the decision or attempted to do more regarding her worker's compensation benefits. (ECF No. 20 at 6).

---

[1] Jackson denies ever receiving the Form and it lacks her signature. (ECF No. 26 at 4).
[2] The policy delineates that "excused absences" include "Personal Time Off Pre-Approved by Supervisor – Authorization is required in advance from your manager." (ECF No. 20 at 3).
[3] During discovery, Jackson produced text messages between her and her manager, Hoelle, regarding these three absences. (ECF No. 20 at 5). None of the text messages state that the absence was excused. (*Id.*). And, at her deposition, Jackson conceded that she thought the absences were excused just because she told her boss she would not be at work—irrespective of Hoelle's response. (*Id.*).
[4] The same notice stated that EMS's worker's compensation carrier had been unable to contact Jackson. (ECF No. 21-2 at 111).

In June 2021, Jackson alleges that she reported to EMS's human resources personnel, Kirsten Dugan ("Dugan"), that her supervisor was subjecting her to harassment. (ECF No. 26 at 11-12). Her complaints were based on text messages with Hoelle where he requested that she submit a doctor's note for a recent absence. (ECF No. 28 at 13). In the text exchange, Jackson calls this "harassment." (*Id.*) At no point did Jackson complain to EMS human resources. (*Id.*). Rather, Hoelle provided the text messages to Dugan who determined that the messages did not constitute harassment. (*Id.*).

On August 11, 2021, Jackson received a phone call from her boyfriend informing her that the electricity went out at their home. (ECF No. 20 at 6). Needing to leave her shift, Jackson texted Hoelle asking if he needed anything from her. (*Id.*). Yet Hoelle was not responding. (*Id.*). Jackson then left her belongings in EMS's Fort Wayne office and left her shift early to go home. (*Id.*) There is no dispute that Hoelle never said that she could leave her shift early or that the absence would be excused. (*Id.*).

Because Jackson abandoned her shift on August 11, Dugan and EMS Executive Vice President, Nancy Scheumann ("Scheumann"), reviewed Jackson's attendance history including the March 2021 Form. (*Id.*). Dugan and Scheumann jointly decided to terminate Jackson's employment for repeated violations of EMS's attendance policy. (*Id.*). Schuemann met with Jackson the next day and terminated Jackson based on the violations. (*Id.*). EMS's termination report confirms that Jackson had received a written warning regarding her attendance in March 2021, and that Jackson "left the job location on 8/11/21 during her shift." (*Id.* at 7). At this meeting, apparently Scheumann said that Jackson was under investigation because she had problems with Branch Manager Bloom. (*Id.* at 6).

4

On September 21, 2021, Jackson filed a Charge of Discrimination against EMS with the FW Commission and EEOC claiming race discrimination and retaliation. (ECF No. 21-2 at 165). In the charge, Jackson claimed that she was fired for filing her charges against EMS in 2019.[5] (*Id.*). She also stated that Hoelle told her that other management said she was "angry" and Jackson believed that they were alluding to her being "an angry black woman." (*Id.*). Jackson further asserted that she was accused of stealing gas and that two white coworkers received a "COVID pay raise."[6] (*Id.*). And she mentions another unnamed white employee that hurt herself at work and crashed two company vehicles but was not terminated.[7] (*Id.*). On October 7, 2021, Jackson filed an amended charge that added allegations that she met with human resources before her termination and was terminated for attendance. (*Id.* at 166).

The FW Commission investigated Jackson's charges and found no probable cause to support her allegations. (ECF No. 20 at 10). The EEOC issued its right to sue notice on May 24, 2022. (*Id.*). Jackson filed her Complaint (ECF No. 5) on July 14, 2022.

Jackson's Complaint alleges that several white employees including Laurie Rhoads, Jane Jarvis, Pam Brightfall, Cory Benson, and Dawn Burban had attendance records similar to Jackson but were not disciplined by EMS. (ECF No. 5, ¶ 15). Laurie Rhoads and Jane Jarvis were General Cleaners[8]—not supervisors—and Jackson knew nothing about their attendance records but merely

---

[5] When asked at her deposition, why she believed that her 2019 Charge had anything to do with her August 2021 termination, Jackson explained that during their August 2021 meeting, Scheumann allegedly stated that Jackson "has a problem with Bob [Bloom]," and Jackson interpreted that as referring to her 2019 Charge. (ECF No. 20 at 9).
[6] Even though she swore her charge under oath, Jackson testified in her deposition that she was never accused of stealing gas; her boss just called her and said he did not have her gas receipts. (ECF No. 20 at 9). Regarding her allegation that two white coworkers received "COVID pay raises," Jackson explained that she only knew pay information for some employees "by them coming to [her]." (*Id.*). And she learned of that only after she filed her EEOC complaint. (*Id.*). EMS did not provide employees with COVID pay raises. (*Id.*)
[7] Jackson later identified the employee at her deposition but conceded that she did not know whether the employee's absences were excused or unexcused. (ECF No. 20 at 9).
[8] General Cleaners have different job titles, job duties, supervisors, and were held to a different level of expectation than Jackson in her Area Supervisor role. (ECF No. 20 at 8).

5

realized that they had called off work. (ECF No. 20 at 7). All Jackson knew of Pam Brightfall, another General Cleaner, was that she had missed work because of an injury. (*Id.*). As it relates to Cory Benson, another Area Supervisor, Jackson knew that he had called off work, but did not know whether he was disciplined or whether his absences were excused. (*Id.* at 8). And she did not know whether Dawn Burban's absences were excused or unexcused. (*Id.*). Importantly, none of these alleged comparators accumulated three unexcused absences in a thirty-day period. (*Id.*).

## II. Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n order to withstand summary judgment, the nonmovant must allege *specific* facts creating a genuine issue for trial and may not rely on vague, conclusory allegations." *Gabrielle M. v. Park Forest-Chicago Heights., Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003). Still, a court must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650 (2014).

The Court's role is not to weigh the evidence or evaluate the credibility of the witnesses. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But the "non-movant does not satisfy its burden merely by pointing to self-serving allegations that otherwise are without evidentiary support." *Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994). Indeed, "summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005), *cert. denied*, 546 U.S. 1033 (2005) (quotations omitted).

## III. Discussion

Jackson asserts claims for race discrimination and retaliation against EMS seeking relief under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981.[9] (ECF No. 5). In the alternative, she claims that EMS retaliated against her for applying for worker's compensation benefits in violation of Indiana law under *Frampton v. Cent. Indiana Gas Co.*, 297 N.E.2d 425 (Ind. 1973) ("*Frampton*"). EMS moves for summary judgment on all claims asserted in Jackson's Complaint. (ECF No. 5).

EMS first attacks Jackson's prima facie showing of discrimination under Title VII and Section 1981. It contends that Jackson's case fails because there is no dispute that she violated EMS's attendance policy at the time of her discharge. (ECF No. 22 at 1). And EMS believes that Jackson cannot identify any similarly situated EMS employees outside the protected class that were treated more favorably. (*Id.* at 1-2). EMS also argues that no evidence suggests that Jackson's termination has anything to do with her 2019 Charge of Discrimination which would support a retaliation claim. (*Id.* at 2). And, in the same vein, it posits that "the evidence is bare of any indication that [Jackson's] June 2021 injury and worker's compensation claim was related to her discharge." (*Id.*)

Rather than attempting to establish her prima facie case of discrimination, Jackson jumps straight to allegations that EMS's decision to discharge her was pretextual. *See Scruggs v. Garst*

---

[9] EMS failed to address Jackson's Section 1981 claims in its initial brief in support of summary judgment, and Jackson asks this Court to view EMS's Motion as a partial Motion for Summary Judgment. (ECF Nos. 19, 22). Though EMS did not cite Section 1981, the standards for analyzing discrimination and retaliation under Title VII and Section 1981 are the same. *Gonzalez v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998) ("The same standards governing liability under Title VII apply to section 1981."); *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015) ("We apply the same standards to Title VII and § 1981 discrimination and retaliation claims."). Federal Rule of Civil Procedure 56(f)(2) permits this Court to "grant the motion [for summary judgment] on grounds not raised by a party." Fed. R. Civ. P. 56. And ruling on the Section 1981 claims along with the Jackson's Title VII claims supports this Court's pursuit of judicial economy. *Lee v. Mkt. Am., Inc.,* 2022 WL 580474, at *2 (M.D. N.C. Jan. 20, 2022) ("However, while Defendant's oversight should not be countenanced, there is some degree of similarity in the applicable law between a retaliation claim under § 1981 and a discrimination claim under Title VII and § 1981, which Defendant has fully briefed. This court finds judicial economy and the ends of justice are furthered by addressing related claims rather than potentially reaching inconsistent results.").

*Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) ("The prima facie case and pretext analyses often overlap, so we have said that we can proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action."). And she points to a myriad of alleged factual discrepancies which Jackson believes reveals that EMS's proffered explanation fails the smell test. (ECF No. 26 at 8-11). As for retaliation, she claims that her "reporting" of harassment in June 2021 partnered with her 2019 Charge create an adequate causal nexus to preclude summary judgment. (*Id.* at 11-12). Lastly, Jackson contends that a reasonable jury could find that her termination was directly related to her worker's compensation claim as it was under investigation when she was discharged. (*Id.* at 12-15).

None of the disputes that Jackson highlights create a question of fact sufficient to withstand summary judgment here. And much of Jackson's contentions focus on her interpretation of EMS's unambiguous attendance policy under which three unexcused absences within thirty days and leaving early are violations. She first violated this policy in February 2021 after obtaining three unexcused absences. When Jackson abandoned her shift on August 11, 2021, EMS terminated her. The evidence does not suggest anything more nefarious. Thus, summary judgment in EMS's favor is appropriate.

### A. Title VII and Section 1981 Claims

Title VII forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is

enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981. The analysis of a Title VII claim and a Section 1981 claim are the same, and cases discussing claims under either provision are instructive. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013) ("The substantive standards and methods that apply to Title VII also apply to 42 U.S.C. § 1981"). Thus, this Court's analysis applies with equal force under both provisions. *See Messer v. Meno*, 936 F. Supp. 1280, 1292 (W.D. Tex. 1996), *aff'd in part and rev'd in part, remanded in part*, 130 F.3d 130 (5th Cir. 1997) ("[Section] 1981 affords no greater protection than Title VII" and "where the plaintiff has alleged violations of both Title VII and [Section] 1981, the Court, as a rule, will consider the claim under [Section] 1981 only if violation of that statute can be made on grounds different from those available under Title VII.").

Discrimination claims may be reviewed on summary judgment under the direct or the burden-shifting methodologies. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). When a plaintiff responds to a motion for summary judgment on an intentional discrimination claim by relying on the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a court should assess the case in those terms. *Id.*; *see also Ferrill v. Oak-Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (noting that *McDonnell Douglas* burden-shifting analysis has not been displaced). However the plaintiff chooses to proceed at the summary judgment stage, the Court must consider all the evidence together to determine whether a reasonable jury could "conclude that the plaintiff's…[race] caused the discharge." *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d. 760, 765 (7th Cir. 2016).

Under the burden-shifting approach, the plaintiff must come forward with evidence that (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably. *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). If the plaintiff has established this prima facie case, the burden shifts "to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Id.* (citation omitted).

To that end, EMS asserts that Jackson cannot meet their prima facie burden under the *McDonnell Douglas* burden-shifting test. (ECF No. 22 at 1). And Jackson does not attempt to. Yet the Seventh Circuit has held that the rigid dictates of *McDonnell Douglas* have become too far removed from the from the "statutory question of discriminatory causation," such that the Court can rely on the "straight-forward analysis of whether a reasonable jury could infer prohibited discrimination." *Hitchcock v. Angel Corps*, 718 F.3d 733, 737 (7th Cir. 2013); *See also Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020) ("The plaintiff need not rely on the *McDonnell Douglas* method to carry that burden; she may well have other 'direct or circumstantial evidence that supports an inference of intentional discrimination.'" (citation omitted)). Said differently, the Court may "proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action." *Scruggs,* 587 F.3d at 838.

Because Jackson declined to address the burden-shifting method in her response (ECF No. 26) and only alleged that EMS's proffered reason for termination is pretextual, the Court can proceed directly to the pretext analysis.[10] The ultimate question being: "has the non-moving party

---

[10] This Court may still analyze and weigh the evidence under the *McDonnell Douglas* framework although Jackson proceeded under the other standard. As the Seventh Circuit has explained, the "*McDonnell Douglas* framework for

produced sufficient evidence to support a jury verdict of intentional discrimination?" *David,* 846 F.3d at 224 (7th Cir. 2017).

To show pretext, Jackson must reveal that EMS's proposed reason for the adverse action—her termination—is "an attempt to mask a discriminatory reason with a legitimate excuse." *Brooks v. Avancez,* 39 F.4th 424, 434 (7th Cir. 2022). A plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [the defendant's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings*, LLC, 489 F.3d 781, 792 (7th Cir. 2007). Jackson advances four arguments to suggest EMS's reason for termination was a pretext for discrimination. Yet none of her arguments create a question of fact sufficient to survive summary judgment—even when viewed together. *See Ortiz*, 834 F.3d at 765 ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself ....").

First, Jackson disputes that she ever received the March 2021 Form which memorializes three unexcused absences within a thirty-day period. (ECF No. 26 at 8). Indeed, the "Date of Communication" line is left blank and the Form lacks Jackson's signature. (ECF No. 21-3 at 5). But the Form also explains that Jackson refused to sign it. (*Id.*). And although Jackson now claims she did not receive the Form, she contradicts her deposition testimony where Jackson repeatedly claimed that she could not recall whether she received it. (ECF Nos. 26 at 8, 21-1 at 78:7-81:21). Even still, Jackson only denies that she "reciev[ed]" the notice. (ECF No. 26 at 4). She does not

---

evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases. There is no magic to this test; it is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor. But because the framework is helpful we use it to evaluate each of the plaintiffs' claims." *Johnson v. Advoc. Health & Hosps. Corp.,* 892 F.3d 887, 894–95 (7th Cir. 2018) (citations omitted). Although the Court only conducts the pretext inquiry, the evidence from EMS's *McDonnell Douglas* analysis (ECF No. 22 at 3-6) is incorporated where appropriate.

argue that the unexcused absences never occurred. Nor does she contend that the absences did not violate EMS's attendance policy. And, without personal knowledge, she cannot claim that the Form was not in her personnel file or that EMS reasonably relied on it as a basis for termination.[11] *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 824 (7th Cir. 2006) ("in determining whether an employer's proffered reason for an employment action was pretextual, we are not concerned with the correctness or desirability of reasons offered for employment decisions, but rather the issue of whether the employer honestly believes in the reasons it offers").

Second, Jackson attacks the attendance policy itself as being ambiguous such that the jury should get to decide whether she violated it on August 11, 2021. The policy is clear: texting the employee's supervisor "is considered an improper reporting of an absence." (ECF No. 20 at 5). On August 11, 2021, Jackson texted her supervisor before abandoning her shift. Jackson makes the hair-splitting argument that "improper" does not mean "will not be accepted." (ECF No. 26 at 8). She also indicates that texting was the most common form of communication between Jackson and her managers. And Jackson, as a supervisor, allowed her employees to communicate their absences via text message. Regardless of these assertions, the text messages do not demonstrate that her absence was excused. Jackson effectively admitted in her deposition that she was not excused. (ECF No. 21-1 at 119:4-9) ("Q: So who from the company told you your absence was excused that day? A: I notified Ron [Hoelle], and I believe I asked him was there any problems or something like that. I can't recall. But Ron never said anything to me.").

---

[11] Jackson also contends that the Form is "fishy" because it indicates incident dates that range from January 18, 2021, until February 5, 2021, but was not signed by a supervisor or manager until March 31, 2021. She believes that this, partnered with the lack of signature and blank date of communication, could allow a reasonable to infer that the Form was created for reasons other than those stated. (ECF No. 26 at 8). The form merely being "fishy" implies nothing more than speculation. *See Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion"); *See also Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) ("Discrimination law would be unmanageable if disgruntled employees . . . could defeat summary judgment by affidavits speculating about the defendant's motives.").

In a further effort to cloud the clear policy, Jackson thinks she held the reasonable belief that if she had PTO, her absence would be automatically excused by simply telling Hoelle that she was going home early. Under the policy, "excused absences" include "Personal Time Off Pre-Approved by Supervisor – Authorization is required in advance from your manager." (ECF No. 21-1). As mentioned above, Jackson's managers never approved her absence. But Jackson thinks this provision clashes with two other provisions concerning PTO. The first is Defendant's PTO policy where it states, "PTO is designed to ensure that employees continue to receive their regular pay during approved absences. An employee on an approved absence can use his or her PTO to continue to receive pay no matter what the reason for the absence is." (*Id.*). And the policy further provides that "[a]n employee is not permitted to take an unpaid absence if he or she has PTO available." (*Id.*).

The Court fails to understand how Jackson's belief was reasonable based on these provisions. None of the language would cause a reasonable person to believe that Jackson's PTO would automatically apply to save her unapproved, unexcused absence. Even if Jackson honestly held this belief, her subjective belief as to how she thought the attendance policy worked is immaterial. *See Kizer v. Children's Learning Ctr.*, 962 F.2d 608, 613 (7th Cir. 1992) ("[A] subjective belief of discrimination no matter how genuine, cannot be the sole basis for a finding of discrimination.") (quotation omitted). One thing is for certain: Jackson never obtained approval to use her PTO, so her shift abandonment was unexcused.

"Each [EMS] employee is expected to…continue to work through the end of their scheduled shift." (ECF No. 21-2). On August 11, 2021, Jackson abandoned her shift in violation of the policy's plain language. "Employees violating the EMS Attendance Policy may be subject

13

to disciplinary action up to and including discharge" (*Id.*). The next day, EMS discharged Jackson. These events do not demonstrate pretext.

Third, Jackson contends that "[EMS's] assertion that Jackson 'abandoned' her job is unworthy of credence" because the EMS handbook defines "job abandonment" as failing to work without explanation for three consecutive days. (ECF No. 26 at 10). On August 11, Jackson reported to work and performed some duties before leaving early. Indeed, under EMS's policies, that is not "job abandonment." But EMS never contends that her actions constituted "job abandonment" as defined by the handbook. Rather, it simply concluded that Jackson abandoned her shift on August 11, 2021, by leaving early—which is true. (ECF No. 20 at 6) ("Jackson abandoned her shift on August 11" and "August 11 shift abandonment"). And, as mentioned, her leaving early is a violation. This argument is a non-starter.

Lastly, Jackson contends that EMS presented inconsistent reasons for her termination. (ECF No. 26 at 10-11). After her discharge, Jackson filed for unemployment insurance benefits with the Indiana Department of Workforce Development ("IDWD"). During litigation over Jackson's benefits, EMS emailed the IDWD an exhaustive list of unexcused absences. Indeed, Jackson successfully proved to the IDWD that at least one absence on the list was excused. (ECF No. 26-7). Yet EMS alleged only that some of those absences served as the basis of her termination. EMS's email does not state which absences it relied on in making its decision to terminate Jackson. From the record, it appears that EMS's position has always been that Jackson's three unexcused absences from early 2021 and her August 11 shift abandonment were the reasons for her termination. And EMS has documentation to back its position. (ECF Nos. 21-2 at 159-160, 162 and 21-3, ¶ 6).

In sum, there is no evidence that EMS's legitimate reason for terminating Jackson were pretextual. She clearly violated EMS's attendance policy. *Motley v. Tractor Supply Co.,* 32 F. Supp. 2d 1026, 1038 (S.D. Ind. 1998) ("[The plaintiff's] evidence would not allow a rational jury to find that he had been performing his job satisfactorily . . . [when] the evidence shows that TSC discharged him based on his violation of its written attendance policy . . . ."). Nothing in the record appears to implicate Jackson's race whatsoever. Perhaps Jackson's focus is on her 2021 charge where she states Hoelle told her that Bloom said she was "angry most of the time." (ECF No. 21-2 at 165). It was Jackson's subjective belief that EMS management was "alluding to [her] being an angry black woman." (*Id.*). But merely saying that somebody is angry does not implicate race. *Humphries v. City Univ. of New York*, 2013 WL 6196561, at *9 (S.D.N.Y. Nov. 26, 2013) (calling the plaintiff "angry," "belligerent," "disruptive," "hostile," "threatening," and "aggressive" were not evidence of the "angry black woman" stereotype). And Jackson's subjective interpretation is immaterial to this Court's pretext analysis. *See Kizer,* 962 F.2d 608 at 613 ("[A] subjective belief of discrimination no matter how genuine, cannot be the sole basis for a finding of discrimination.") (quotation omitted). The record is devoid of any evidence of pretext here. Thus, EMS is entitled to summary judgment on Jackson's discrimination claims.

Jackson's retaliation claims under Title VII and Section 1981 fare no better. To prove her retaliation claim, Jackson must show that: (1) she engaged in protected activity; (2) she suffered a materially adverse action by EMS; and (3) there was a causal link between her protected activity and the adverse action. *Porter v. City of Chicago*, 700 F.3d 944, 951-52 (7th Cir. 2012). There is no dispute that Jackson's termination was a materially adverse action. Even still, the other two elements create insuperable hurdles for Jackson.

15

Jackson points to two instances of alleged protected activity: her 2019 Charge of Discrimination and her complaint of harassment in June 2021. EMS does not dispute that Jackson engaged in protected activity by filing her 2019 Charge. The FW Commission and EEOC investigated that claim and found no probable cause to suggest that EMS violated Title VII. Jackson did nothing more to prosecute those allegations, so the matter was closed. And temporal proximity is lacking here. *See Young-Gibson v. Bd. of Educ. of City of Chicago*, 558 F. App'x 694, 699 (7th Cir. 2014) ("The significant delay between the time that Young–Gibson filed the administrative charge and her second suspension (7 months), reassignment (11 months), and discharge (18 months) would prevent a jury from reasonably concluding, based on 'temporal proximity' alone, that the Board retaliated against her for filing the charge."). Jackson's March 2021 written discipline occurred more than 19 months after she filed her Charge, while Jackson's termination occurred 24 months later.

The only reason Jackson believes her 2019 Charge and discharge are connected is because during her termination meeting, Scheumann allegedly stated that Jackson "had a problem" with Branch Manager Bloom. But Jackson's subjective view that this comment somehow implicated an EEOC charge from two years prior is irrelevant to her retaliation claim. *See Kizer,* 962 F.2d at 613. And her own testimony confirmed that Scheumann never referenced the 2019 Charge during that meeting. (ECF No. 21-1 at 181:7-13).

Jackson, to try to save her claim, points to her complaint of "harassment" on June 21, 2021, as an alleged protected activity. (ECF No. 26 at 11-12). She alleges that Scheumann's comment during her termination meeting about Bloom could also be related to her June 2021 complaint which is evidence of retaliatory motive. (*Id.*). And Jackson contends that once EMS human

16

resources received her complaint, Dugan dismissed her concerns via email without even speaking with Jackson. (*Id.*). A quick analysis of the facts turns this argument on its head.

EMS provided the text messages which formed the basis for Jackson's "complaint." (ECF No. 27-3). First, the actual text messages where Jackson "complains of harassment" are with Area Manager Hoelle—not Branch Manager Bloom. (ECF No. 27-3 at 3-4). Scheumann's comment about a problem between Jackson and Bloom are unrelated to Jackson's complaint against Hoelle. Second, Jackson complains of harassment in the text messages because Hoelle asked her to submit a doctor's note in relation to a recent absence—to which she said in response was "harassment."[12] (*Id.*). Resisting a request for a doctor's note is not a protected activity. *See Kim v. FNS, Inc.*, 2023 WL 6049913, at *8 (N.D. Ill. Sept. 15, 2023) ("the activity of Kim taking a medical leave is not protected activity under Title VII"); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class."). Third, Jackson never "reported" or "complained" to EMS's human resources department at all. Indeed, Hoelle provided the text message exchange to Dugan, who then reviewed the exchange and determined it was not harassment. (ECF No. 27-3 at 1-2).

The record is absent of any evidence suggesting that Jackson's 2019 Charge had anything to do with her discharge. And her June 2021 "complaint" was not a protected activity or related to her discharge in any way. Thus, summary judgment in EMS's favor is warranted on Jackson's Title VII and Section 1981 claims.

**B.** *Frampton* **Claim**

---

[12] Jackson even conceded in her deposition that her only complaint was about Hoelle requesting a medical record. (ECF No. 21-1 at 33:2-35:8).

Only Jackson's state-law claim remains. She alleges that EMS retaliatorily discharged her for filing a worker's compensation claim—a statutory benefit under Indiana's Workers' Compensation Act. *See* Ind. Code § 22-3-2 et seq. Although Jackson did file a worker's compensation claim in June 2021, there is no evidence that Jackson's termination had anything to do with that claim. As with her Title VII and Section 1981 claims, Jackson's *Frampton* claim cannot survive summary judgment.

Retaliation claims based on filing a workers' compensation claim were recognized as actionable by the Indiana Supreme Court in *Frampton,* 297 N.E.2d 425. In *Frampton*, the Court held that a plaintiff who demonstrates that he or she was discharged by an employer for filing a claim under Indiana's Worker's Compensation Act "has stated a claim upon which relief can be granted." *Id.* at 428. "[U]nder ordinary circumstances, an employee at will may be discharged without cause," but "when an employee is discharged solely for exercising a statutorily conferred right an exception to the general rule must be recognized." *Id.* at 428. Indiana Courts hold "that use of the word 'solely' by the *Frampton* court means only that any and all reasons for the discharge must be unlawful in order to sustain the claim for retaliatory discharge." *Purdy v. Wright Tree Serv., Inc.*, 835 N.E.2d 209, 212 (Ind. Ct. App. 2005).

Indiana courts have "outlined and consistently followed a three-step approach to a retaliatory discharge *Frampton* claim under Indiana law." *Best Formed Plastics, LLC v. Shoun*, 51 N.E.3d 345, 351 (Ind. Ct. App. 2016). First, Jackson must prove a prima facie case of retaliation by showing that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Purdy*, 835 N.E.2d at 213. In doing so, "[t]he employee must present evidence that directly

18

or indirectly supplies the necessary inference of causation between the filing of a worker's compensation claim and the termination." *Id.*

Second, if the employee makes this prima facie showing, "[t]he burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the discharge." *Id.* Third and finally, "if the employer carries that burden, the employee can prove, by a preponderance of the evidence, that the reason offered by the employer is a pretext. This can be done by showing, for example, that the employer's proffered reason is factually baseless, is not the actual motivation for the discharge, or is insufficient to motivate the discharge." *Id.* at 213 (citations omitted). "[T]o survive a motion for summary judgment in a *Frampton* case, the employee must show more than a filing of a workers' compensation claim and the discharge itself." *Id*. at 212.

Jackson's analysis under *Frampton* is wanting. After regurgitating quotations from *Frampton* cases, Jackson does not even follow the three-step approach under Indiana law. Jackson merely states:

> In the case at bar, Defendant was actively investigating the workers compensation claim made by Jackson on June 14, 2021. Jackson has already set forth that the proffered reasons for her termination are inconsistent with the evidence before the Court, and incorporates those arguments herein to establish that the filing of the workers compensation claim may be the reason for the adverse action she suffered. Suspiciously, the workers compensation claim was ultimately denied, just days after Jackson's termination, on August 26, 2021.

(ECF No. 26 at 14-14). Unlike *McDonnell Douglas,* the Court is unaware of any authority—and the parties have provided none—suggesting that a *Frampton* plaintiff can skip past their "prima facie case of discrimination" and move directly to addressing pretext. *Purdy*, 835 N.E.2d at 212. Although pretext can be evidence of causation, the Court finds Jackson's analysis lacking. Perhaps to try to make a haphazard causation argument, she aims to incorporate her Title VII and Section 1981 arguments over pretext. Not only did Jackson place the cart before the horse, but those

arguments apply to an entirely different protected activity. And, in any event, the Court has already found those arguments meritless.

Without support from those arguments, Jackson only points to the proximity of her worker's compensation claim and her termination. *See Purdy*, 835 N.E.2d at 212 ("[T]o survive a motion for summary judgment in a *Frampton* case, the employee must show more than a filing of a workers' compensation claim and the discharge itself."). All Jackson has is timing. And timing alone is insufficient. *See Malone v. Wal-Mart Stores*, 20 Fed. Appx. 547, 550 (7th Cir. 2001) ("[W]ithout any other evidence to support his claim, such proximity in time alone does not create a genuine issue of material fact.").

Thus, EMS is entitled to summary judgment on Jackson's *Frampton* claim too.

### IV. Conclusion

For these reasons, Defendant's Motion for Summary Judgment (ECF No. 19) is GRANTED. Summary judgment is GRANTED in favor of Defendant and against Plaintiff as to all claims asserted in Plaintiff's Complaint (ECF No. 5). The CLERK is DIRECTED to enter judgment in favor of Defendant.

SO ORDERED on February 12, 2024.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT